Daisy CANADAY, Lucy Roman, Melinda Panell, Teresa Rodriguez and Rebecca Booker, on behalf of themselves and their children and other dependent minors in their care, and on behalf of all others similarly situated, and The Coalition For the Homeless, Plaintiffs,

v.

Edward I. KOCH, as Mayor of the City of New York, George S. Vernez, as Acting Commissioner of the New York City Human Resources Administration, and Cesar A. Perales, as Commissioner of the New York State Department of Social Services, Defendants.

No. 84 Civ. 3900.

United States District Court, E.D. New York.

Dec. 17, 1984.

Washington Square Legal Services, Inc., Nadine Strossen, Paul Weiss, Rifkind, Wharton & Garrison, Jay Greenfield, Coalition for the Homeless, Robert Hayes, New York City, for plaintiffs.

Robert Abrams, Atty. Gen. of the State of N.Y., Lillian Z. Cohen, Asst. Atty. Gen., New York City, for Perales.

Corp. Counsel of the City of New York, Law Dept., Antonia Levine, New York City, for Koch and Vernez.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiffs [1] bring this action pursuant to 42 U.S.C. § 1983, the equal protection clause of the United States Constitution, the Social Security Act, the New York Social Services Law and the New York City Code of Rules and Regulations, challenging defendants' alleged failure to provide lawful emergency housing to homeless families with children. Defendants have moved to dismiss this action due to improper venue. In the alternative, defendants move to transfer this action to the Southern District of New York, or for this Court to abstain from exercising its jurisdiction due to the pending state court proceeding in *McCain v. Koch*, No. 41023/83.

For the reasons set forth below, defendants' motion to transfer this action to the Southern District of New York is granted pursuant to 28 U.S.C. § 1406(a).[2]

### I. *Background*

Plaintiffs are five homeless, indigent mothers with children who are allegedly

---

**1.** Although the caption of this action gives one of the named plaintiff's name as Daisy Canaday, that plaintiff's affidavit reveals that the correct spelling of her name is Cannady. Similarly, the accurate spelling of Melinda Panell's surname is Planell. The correct spelling of these names will be used herein.

**2.** 28 U.S.C. § 1406(a) provides:

The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

In contrast, § 1404(a) provides:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

"at immediate risk of being denied emergency housing" by the defendants and seek certification as a "class of homeless families with children who have been, are being, or will be denied lawful emergency housing by the defendants." In addition, plaintiffs seek a declaration that defendants' failure to provide plaintiffs with such housing violates the laws cited above, an order preliminarily and permanently requiring defendants to provide plaintiffs with such housing, as well as costs and attorneys' fees.[3]

Defendant Koch is sued in his official capacity as the Mayor of the City of New York. His official residence is City Hall, which is located in the Southern District of New York. Defendant Vernez is sued in his official capacity as Acting Commissioner of New York City Human Resources Administration ("HRA"), and he maintains an official residence at 250 Church Street in the Southern District of New York. Defendant Perales, sued as the Commissioner of the New York State Department of Social Services ("DSS"), has official residences in Albany, located in the Northern District of New York, and at Two World Trade Center, in the Southern District of New York.

This action was commenced with the simultaneous filing of a complaint and order to show cause for class certification and preliminary injunctive relief on September 24, 1984. After being advised by counsel for defendants of their challenge to venue and jurisdiction, this Court permitted the parties to brief and argue these issues while the original order to show cause was held in abeyance.

At the time this complaint was filed, the named individual plaintiffs were being sheltered in temporary emergency housing provided by the City defendants. However, it is the process by which these plaintiffs were required to obtain housing, as well as alleged failures of that process, which caused plaintiffs to file this action.

In essence, the system by which homeless families obtain emergency shelter operates as follows: The HRA operates some forty income maintenance centers (IMCs) in New York City, at least nineteen of which are located in the Eastern District. Affidavit of Thomas H. Styron, dated October 2, 1984 ("Styron Aff.").[4] It is undisputed that when a homeless family first seeks to obtain emergency housing, the family first goes to an IMC in the home borough. The IMC refers the applicant to emergency shelter or sends the family to HRA's emergency assistance unit ("EAU") in Manhattan, which is also the only office connected with sheltering the homeless that is open after 5:00 P.M.[5] From the EAU, applicants are referred to hotels or "barracks-style" emergency housing. Plaintiffs state that twenty of the fifty hotels to which homeless families are referred by the EAU are located within the Eastern District. The purported liability of defendant DSS arises from the fact that DSS supervises HRA's operation of the IMCs, and regulates, inspects and funds the shelters to which homeless families are referred. In addition to operating the IMCs, plaintiffs state that HRA also operates or funds the shelters mentioned above. Styron Aff. ¶¶ 4, 6.

The five named plaintiffs and their children allege that they became homeless for a variety of reasons ranging from eviction

---

3. In addition to the named plaintiffs and their purported class, the Coalition for the Homeless is party to this action. The Coalition alleges that it is a "privately supported not-for-profit corporation which expends its resources in efforts to enforce the rights of New York City's homeless poor" and that it has been required to expend substantial resources to counteract defendants' alleged wrongful conduct.

4. The Styron Affidavit does not discuss any IMCs in Richmond County.

5. During the pendency of these motions, plaintiffs informed this Court that additional emergency welfare offices were scheduled to be opened at one location in Kings County and one location in Queens County—both within the Eastern District. Plaintiffs contend that this occurrence bolsters their argument that venue is proper in this District. As set forth in detail, *infra*, however, I find that venue is not properly laid in this District notwithstanding the intended opening of these new offices. *See infra* at Sections II.B. and C.

to domestic violence. Three of the plaintiffs submitted affidavits detailing their dealings with the IMCs and EAU in support of their order to show cause for injunctive relief and class certification, which affidavits are summarized here. Daisy Cannady, the only named plaintiff who last resided in the Eastern District before becoming homeless, alleges that after receiving a few nights of emergency placement, she was not given a further placement by the IMC nor referred to the EAU for further assistance. Cannady[6] then went on her own to the EAU where she and her family were referred to a barracks-style shelter at Roberto Clemente State Park ("Clemente") in the Bronx. Because plaintiff and her husband felt this shelter to be unsuitable due to their daughter's respiratory problems, they chose to stay overnight at the EAU office.

On September 20, the IMC allegedly directed Cannady not to return to the EAU due to the unavailability of placements. However, Cannady again returned to the EAU and stayed there overnight with her family. On September 21, plaintiff was turned away from the EAU because she lacked a referral from the IMC. After an attempt to secure a referral slip at the Clemente shelter, plaintiff returned to the EAU and was eventually referred to a hotel in Queens, where she remained at the time this action was instituted.

Plaintiff Planell last resided in the Bronx and was allegedly denied shelter at Clemente on September 14. She was later referred by the EAU to a Queens hotel placement for that night, but spent the following night in the EAU office because no placements were available. After spending the next five nights in a Bronx hotel, Planell was on September 21 referred by her IMC to a barracks style shelter in Brooklyn, which turned her away, allegedly due to her pregnancy. She then returned to the EAU and was placed in a Manhattan shelter until September 28.

**6.** References in the text of this opinion to an individual plaintiff are intended to include that plaintiff's family as well. Plaintiff Cannady has one child and a physically disabled husband.

Plaintiff Booker, who last resided in Manhattan, was referred by her local welfare office to a barracks-style shelter in the Bronx on September 21. When she was allegedly turned away at the shelter, she and her three children were taken to the EAU. After spending most of the night there, they were sent to a Queens hotel. Booker spent the next night at the EAU.

Plaintiffs Roman and Rodriguez have not submitted affidavits regarding their interaction with the IMCs and EAU. The complaint, however, alleges that Roman last lived in New York County. On September 19, the EAU allegedly referred her and her three children to a Bronx shelter. The family was robbed of food and clothing on its way to the shelter and was allegedly turned away at the shelter due to lack of space. The family returned to the EAU and eventually received a placement at 3:00 A.M.

Plaintiff Rodriguez allegedly had to split up her family to find shelter for herself and her three children after she became homeless in August 1984. Although the complaint alleges that the Rodriguez family spent some time on the streets and living with friends in overcrowded conditions since that time, there are no allegations as to the present whereabouts of the family.

II. *Discussion*

I note preliminarily that it is more than circumstance which brings plaintiffs to the venue of the Eastern District of New York. The plaintiffs candidly admit that they are in this Court because they believed they would obtain a ruling here that would be favorable to them. When they filed this action, plaintiffs informed the Clerk of this Court that this case should be assigned pursuant to Rule 3 of the Rules for the Division of Business among District Judges for the Eastern District as a case "related" to *Koster v. Perales*, 82 Civ. 2892 (ILG).

Plaintiff Planell has three children and was eight months pregnant at the time this action was commenced. Plaintiff Booker has three children as do plaintiffs Roman and Rodriguez.

That rule mandates assignment of a case to the judge to whom the first case filed was assigned. A case is "related" under Rule 3(a) "when, because of similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of the time of the whole court is likely to result if the cases are assigned to the same judge."

In *Koster*, plaintiffs purport to represent two classes of homeless families who have allegedly either been denied emergency shelter or furnished with inadequate emergency shelter in Nassau County. On November 9, 1983, I denied a motion to dismiss made by the two county defendants in that case. *Koster v. Webb*, 598 F.Supp. 1134 (E.D.N.Y.1983).[7] While it is true that the legal issue of the right of the homeless to emergency housing is presented in both cases, the facts and parties of *Koster* and *Cannady* differ. Moreover, however related these cases may be, the local related case rule cannot be read to lay venue where it does not exist.

The specific venue provisions implicated in this proceeding are 28 U.S.C. § 1391(b) and § 1392(a), which provide:

§ 1391. Venue generally

* * * * * *

(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.

§ 1392. Defendants or property in different districts in the same State

(a) Any civil action, not of a local nature, against defendants residing in different districts in the same State, may be brought in any of such districts.

Plaintiffs contend that venue is proper under *either* § 1391(b) or § 1392(a). I will address each of these claims separately, considering first those based on defendants' residence.

### A. Venue Under § 1391(b) Based on Defendants' Residence

As stated above, venue is properly laid under § 1391(b) in the district where all defendants reside or in which the claim arose. Plaintiffs claim that the Eastern District of New York meets either prong of the § 1391(b) test.

It is settled law that under § 1391 the "residence" of public officers such as these defendants means his or her "official" and not "actual" residence. *Birnbaum v. Blum*, 546 F.Supp. 1363, 1366 (S.D.N.Y.1982). While in suits against federal officers, courts have found only one official residence for venue purposes, policy reasons may warrant the recognition of multiple residences when considering venue in a suit against state officers. *Cheeseman v. Carey*, 485 F.Supp. 203, 207 (S.D.N.Y.1980), *remanded on other grounds*, 623 F.2d 1387 (2d Cir.1980) (court "should be willing to consider whether any defendant has more than one official residence for purposes of the particular litigation").[8]

At the outset, I note that the parties do not dispute that venue would be proper under this section in the Southern District of New York based on the residence of all of the defendants.

Plaintiffs urge that all defendants reside within the Eastern District under the reasoning set forth in *Cheeseman, supra, South Ogden CVS Store, Inc. v. Ambach*, 493 F.Supp. 374 (S.D.N.Y.1980) ("*South Ogden*"), and *Buffalo Teachers Federation, Inc. v. Helsby*, 426 F.Supp. 828 (S.D.N.Y.1976). In *Buffalo Teachers*, the court squarely addressed the issue of "when, if

---

**7.** Arthur Webb was the acting commissioner of DSS at the time the *Koster* action was commenced. Cesar Perales was appointed as commissioner of that agency since that time. Accordingly, Perales was substituted as a named defendant pursuant to Fed.R.Civ.P. 25(d).

**8.** The Second Circuit remanded *Cheeseman* because it found that the action should have been dismissed as moot at the time that the district court rendered its decision. The appellate court therefore did not address the venue issue, although it did characterize the district court's lengthy discussion of venue as "scholarly." 623 F.2d at 1391.

ever, a state governmental entity can be said to have more than one official residence for venue purposes." 426 F.Supp. at 829. Plaintiffs there brought suit against three members of the New York Public Employment Relations Board ("PERB"), which had its headquarters in the Northern District of New York and an additional official residence in the Southern District. The court first considered the factors which weigh against finding that a *federal* defendant has more than one residence for venue purposes, namely, forum shopping and the possibility of the federal government having to respond to suit in any district where an employee resided. Finding that these policies did not prevent finding multiple residences in suits against state or local officials, the *Buffalo Teachers* court denied defendants' motions to dismiss or transfer venue.

In *Cheeseman,* the court agreed with the policies set forth in *Buffalo Teachers* and set forth a three part test to determine whether a state defendant had a second official residence for venue purposes:

> Whether a state defendant has a second official residence would seem to turn on three factors: (1) the defendant's presence in the district in which the plaintiff has sued; (2) the extent of defendant's official activities in the district; and (3) the relationship of the defendant's activities within the district to the cause of action asserted.

485 F.Supp. at 207 (footnote omitted). Defendants were the Governor of New York State, the Office of Employee Relations ("OER") and its Director, the State Comptroller, and other officials who directed agencies involved with employing security officers. As will be discussed further, *infra,* the *Cheeseman* Court rejected plaintiffs' argument that all defendants resided in the Southern District of New York, 485 F.Supp. at 208, but found that § 1391(b) venue did lie in that district as the place where the claim arose. *Id.* at 213.

In *South Ogden,* plaintiff, a licensed pharmacy located in the Western District of New York, sued members or officers of three state agencies which allegedly violated plaintiff's constitutional rights by determining that plaintiff violated certain state laws pertaining to pharmacy advertisements. Defendants were members of the Board of Regents, the State Commissioner on Education and the Executive Secretary of the New York State Board of Pharmacies. The Board of Regents and the Commissioner had official residences in both the Northern and Southern Districts of New York, and the Executive Secretary had an office in the Southern District. The hearing which determined plaintiff's liability under the state laws also took place in the Southern District. The court found that in light of the fact that the violation hearing was held within the Southern District, defendants had failed to demonstrate that they had *not* done a significant amount of business relating to pharmacy regulation in that district. Thus, there was no showing by defendants of any inconvenience to or harassment of state officials by continuing suit in the Southern District, and the court denied defendants' motion to dismiss or transfer for improper venue.

In the instant case, plaintiffs urge that all defendants reside in the Eastern District of New York because they all maintain offices in this District at which they conduct a significant amount of business relating to the provision of emergency housing for destitute homeless people. However, plaintiffs' bare conclusion does not specifically contradict the defendants' affidavits that the only official residences of defendants Koch and Vernez is in the Southern District of New York and that Perales resides in both the Northern and Southern Districts.

While it may be argued that defendant Koch, as Mayor of the City of New York, should be subject to suit in either the Southern or Eastern District, the multiple residence argument is more tenuous with regard to Vernez and Perales. Plaintiffs claim that defendant Vernez resides in the Eastern District because his agency, the HRA, operates numerous IMCs within the District. Similarly, plaintiffs urge that de-

fendant Perales resides in the Eastern District because his agency, DSS, allegedly supervises HRA's operation of the IMCs. *See* Styron Aff., discussed *supra* at 3-4. As suggested by defendants, I find that this interpretation of "official residence" for the purposes of § 1391(b) is strained.

The court in *Cheeseman v. Carey, supra*, was faced with a similar tenuous argument concerning § 1391(b) venue based on the residence of all of the defendants. There plaintiffs contended that defendant OER, which had no office in the Southern District, nevertheless had an official residence there because OER was part of the Executive Branch, which allegedly maintained a substantial office in that district. The defendant Director of OER was therefore said officially to reside in the Southern District because he "acted on behalf of 'the chief fiscal officer of the government involved'" when committing allegedly wrongful acts against plaintiffs. 485 F.Supp. at 208 (*citing* N.Y.Civ.Serv.L. § 210(3)(h)). The court found such contacts insufficient to establish venue because they had "nothing to do with the state official actually being sued." *Id.* Whereas the challenged acts of the Director related to his issuance of plaintiff's paychecks, no part of that payroll function took place in the Southern District.

▪ In the instant case, the state defendant Perales is sued based on his alleged agency's role in denying emergency shelter to homeless families. While it may be true that DSS has some supervisory power over IMCs located in this district, it would be unreasonable to infer that each of the IMCs is an "official" residence of defendant Perales. According to defendant Perales, any relevant decision-making by DSS takes place at either its Northern or Southern District residence. In addition, any alleged final denial of emergency shelter resulting in homelessness would have occurred at the EAU in the Southern District. *See supra* at 3-4.

Without addressing whether defendants Koch or Vernez may be said to have official residences in the Eastern District for purposes of § 1391(b) venue, it is clear that state defendant Perales does not. Therefore, venue under this section based on the residence of *all* defendants is inappropriate.

B. *Venue Under § 1392(a) Based on Residence of Some of the Defendants*

▪ Because plaintiffs also claim venue under this section, *see supra* at 7, I must now address whether defendants Koch and Vernez officially reside in the Eastern District. To this end the recent decision in *Andrew H. v. Ambach*, 579 F.Supp. 85 (S.D.N.Y.1984), is helpful. In that case, plaintiffs were minors requiring special education who alleged that defendants' system of rate-setting did not fully reimburse private schools for the actual cost of educating handicapped children. Defendant Ambach, the New York State Commissioner of Education, allegedly established the rate-setting policy. Defendant Finnery, the New York State Director of the Budget, allegedly approved the policy. Finnery's official duties were carried out in Albany only, while Ambach maintained offices throughout the state. Therefore, just as venue in the instant case would lie in the Southern District of New York based on the residence of all defendants, *see supra* at 8, venue in *Andrew H.* would similarly have been proper in the Northern District.

Plaintiffs in *Andrew H.* urged, however, that venue in the Southern District was proper because Ambach's agency had a Division of Program Monitoring in the Southern District which conducted a significant proportion of the agency's business relating to handicapped students. *Id.* at 89. However, the court chose to accept defendants' argument that Ambach's alleged "official residence" within the Southern District, *i.e.*, the Division, did not conduct any activity in the Southern District related to the litigation. Therefore, while leaving open the issue of whether the Division might be an official residence for purposes of venue in other litigation, the court found that Ambach did *not* have a second

official residence in the Southern District in the *Andrew H.* case. In the present case, the city defendants' challenged policies of allegedly denying emergency shelter to homeless families are made at those officials' residences in the Southern District. While the resulting effect of the alleged denial of shelter may be *felt* in both districts encompassing New York City, that matter goes to the situs of the cause of action, which is addressed *infra* at 15–19.

The court in *Andrew H.* went further to state that *even if* defendant Ambach had a second official residence within the Southern District, venue would still be improper because application of § 1392(a) in such circumstances would emasculate § 1392(b). The court reasoned:

> Even if this court were to find that the Commissioner also has an official residence in New York City, venue still would not lie in this district under section 1392(a). That section applies only to civil actions "against defendants residing in *different* districts in the same state" (emphasis added) The plain meaning of this language seems to preclude the application of section 1391(b) to the present case, in which both defendants reside in the Northern District. Plaintiffs cite some authority interpreting section 1392(a) to confer venue even where all defendants reside in the same district, so long as one defendant also has a residence in a different district.... However, it appears that the better view, based on the language of the section and its underlying policy, holds that where all defendants reside in the same district, section 1392(a) should not apply.

579 F.Supp. at 89 (emphasis in original) (citations and footnotes omitted). Considering the policy underlying § 1392(a) to permit a plaintiff to sue multiple defendants in a single district where otherwise he would have to bring multiple suits, *id.* at n. 6, the court found § 1392(a) inapplicable because the availability of the Northern District as a forum did not confront the parties with the necessity of multiple suits. The same reasoning here warrants the conclusion that venue exists only in the South-

ern District of New York, and that § 1392(a) is inapplicable.

### C. *Venue Under § 1391(b) Based on Where the Claim Arose*

As discussed above, § 1391(b) permits venue to be found in the district "in which the claim arose" as an alternative to the district in which all defendants reside. An understanding of the applicability of this clause to the instant case is aided by a brief overview of the history of the statute. *See generally* 15 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3806 (1976 & Supp.1984).

Prior to 1966, § 1391(b) did not contain the language "or in which the claim arose." Thus, a plaintiff could not commence suit in a district where the claim arose if no party resided there, nor could an action be transferred to such a district pursuant to 28 U.S.C. § 1404(a). Following some earlier amendments, §§ 1391(a) and (b) were amended in 1966 to close this "venue gap" by permitting a suit to be brought in or transferred to a district "in which the claim arose."

The closing of the "venue gap" which existed prior to 1966 has been addressed by the United States Supreme Court in *Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). In that case, Great Western, a Texas corporation, commenced an action in the United States District Court for the Northern District of Texas, challenging the application of Idaho, New York and Maryland corporate takeover laws to a bid which plaintiff had made for shares in an Idaho corporation. Defendants were state officials from the above three states charged with applying those laws. After the claims involving Maryland and New York law were dismissed, the trial court found that venue under § 1391(b) was improper because all defendants resided and the cause of action arose in the District of Idaho. However, venue was found to be proper under § 27 of the Securities Exchange Act of 1934. The district court also held that Great Western was entitled to judgment on the

merits. On appeal, the Fifth Circuit affirmed the district court's decision and additionally held that venue would have been proper under § 1391(b) because the allegedly invalid restraint on Great Western—*i.e.,* the cause of action—arose in the Northern District of Texas. *Great Western United Corp. v. Kidwell,* 577 F.2d 1256 (5th Cir. 1978).

The Supreme Court reversed the Circuit's decision, finding that venue could not be premised upon § 27 of the Securities Exchange Act. The Court also held that § 1391(b) venue would not lie because all defendants resided in Idaho and the cause of action arose in Idaho because that was the forum "where Idaho officials 'invalidly prevented Great Western from initiating a tender offer.'" 443 U.S. at 183, 99 S.Ct. at 2716, 61 L.Ed.2d 464 (citation omitted). In applying § 1391(b) to the record before it, the Court found that Congress did not intend that section to provide plaintiffs with an "unfettered choice among a host of different districts." 443 U.S. at 185, 99 S.Ct. at 2717, 61 L.Ed.2d 464. Rather, the *Leroy* court found, in an oft-quoted passage, that

> the broadest interpretation of the language of § 1391(b) that is even arguably acceptable is that in the unusual case in which it is not clear that the claim arose in only one specific district, a plaintiff may choose between those two (or conceivably even more) districts that with approximately equal plausibility—in terms of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but not of the plaintiff)—may be assigned as the locus of the claim.

*Id.* (citation omitted). The court therefore left open the issue of whether a claim could arise in more than one district.

Cases in this Circuit have concurred with *Leroy* that the "claim arose" language added to §§ 1391(a) and (b) was intended purely to fill the venue gap that had existed prior to the 1966 amendment. In *Cheeseman v. Carey, supra,* for example, the court stated:

> If venue gap filling was Congress' only purpose in amending Sections 1391(a) and (b), it would appear that any given cause of action should be deemed to arise in only one district, *since at that point the venue gap would be filled.* And the most suitable analytical tool for determining in which district venue should lie would seem to be the "most significant contacts" or "weight of the contacts" approach.

485 F.Supp. at 213 (emphasis added) (citation omitted). *See also id.* at 212 ("[m]ultidistrict venue would appear permissible only where the claim had very substantial contacts with, or a close relationship to, each of the districts claimed as potentially appropriate"). Thus, venue based on where the claim arose would be proper in the district "where the vast majority of the acts giving rise to liability took place." *Davis v. Costa-Gavras,* 580 F.Supp. 1082, 1090 (S.D.N.Y.1984).

In the instant case, application of the "weight of the contacts" test would result in a finding that the plaintiffs' claims arose in the Southern District of New York rather than in this district. All of the defendants, whose policies are challenged by plaintiffs, reside in the Southern District and set such policies there. In addition, although members of the purported class last resided in or may have been turned away from IMCs in the Eastern District, it is evident from the pleadings and motion papers that the EAU in the Southern District is where most alleged denials of emergency housing take place. Plaintiffs assert that their claims could be said to arise in the Eastern District because the *effects* of defendants' alleged decisions to deny them emergency shelter are most strongly felt in this district. They base this claim on cases which state that the claim arises in the district where the parties seeking certain benefits *would have received them. See, e.g., Florida Nursing Home Ass'n v. Page,* 616 F.2d 1355 (5th Cir.) *cert. denied sub nom., Taylor v. Golden Isles Convalescent Center,* 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980), *rev'd on other grounds sub nom.,*

*Florida Dep't of Health & Rehabilitative Services v. Florida Nursing Home Ass'n,* 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981);[9] *Sanchez v. Pingree,* 494 F.Supp. 68 (S.D.Fla.1980). This analogy is inapposite, however, because it is clear from plaintiffs' allegations themselves that plaintiffs residing in one district may "receive the benefit" of emergency shelter in another district. *See supra* 598 F.Supp. at 1135–36. Thus, even if plaintiffs can establish that most members of the purported class of homeless families with children last resided in the Eastern District, there has been no showing that they would have been given shelter there.[10]

Based on all of the facts set forth above, I would be inclined to find that plaintiffs' claims arise in the Southern District of New York. However, I find that the reasoning of *Andrew H. v. Ambach, supra,* controls here. Although the court there held that § 1392(a) should not apply when all of the defendants reside in the same district, the policies underlying the amendment of § 1391(b) warrant the same result here. That is, because the "claim arose" language was inserted into § 1391(b) to fill a venue gap created by the residence of defendants in different districts, venue under the "claim arose" language should not be considered when, as here, all defendants do reside in the same district, i.e., the Southern District of New York.

### D. *Transfer of Venue*

Because I conclude that venue does not properly lie in the Eastern District of New York, I must consider defendants' motions to transfer venue under 28 U.S.C. § 1406(a) rather than § 1404(a). *See supra* note 2. In the interests of justice, this case should be transferred to the Southern District of New York. I find it appropriate, however, to address the parties' arguments concerning abstention.

### E. *Abstention*

The parties, on oral argument and in their memoranda of law, have devoted significant thought to the applicability of the abstention doctrine and to the principle that duplicative litigation should be avoided by federal courts within the limits prescribed by *Colorado River Water Cons. Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) and *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Had I concluded that venue was properly laid in this district, I

**9.** In the *Florida Nursing Home Association* case, two separate petitions for certiorari were presented to the Supreme Court. Certiorari was denied as to the petition raising the jurisdictional and venue issues relevant to the instant case. The Supreme Court, however, did entertain the petition which raised the issue of the availability of retroactive relief and Eleventh Amendment immunity, and it was on this issue that the Court reversed the circuit court's decision. 450 U.S. at 148–99 & n. 2, 101 S.Ct. at 1033–34 and n. 2.

**10.** The language referring to where the parties seeking benefits "would have received them" could be read either to mean where the plaintiffs here would be assigned to emergency shelter or where they would actually have been sheltered. Although it is technically accurate to say that some members of the purported class would receive benefits, using either definition, in the Eastern District, there appears to be no way to determine where any particular plaintiff would be sheltered. Also, although assignments to emergency shelter could be made in either the Southern or Eastern District, all persons who are denied shelter at the IMCs eventually seek assignment at the EAU in the Southern District.

Finally, it is noteworthy that in the cases cited by plaintiffs for the proposition that the claim arises where the benefits would be received, the courts found that the benefits "would have been received" where the plaintiffs felt the effect of being denied such benefits and where therefore injured by defendants' actions. *See, e.g., Sanchez v. Pingree,* 494 F.Supp. at 70 & n. 3. Citing *Leroy,* the *Sanchez* court found it "equally plausible that the locus of this claim should be where plaintiffs were denied their benefits as where the "policy" to do so was decided and is administered. *Id.* at n. 3. In contrast to this case, plaintiffs in *Sanchez* were deemed to feel the injury due to an allegedly unconstitutional denial of community care benefits in the district where they resided. Here, however, although many plaintiffs may have *last resided* in the Eastern District before they became homeless, it is not clear that they would have received the benefits they seek within this district.

would nevertheless have stayed this proceeding pending the disposition of the state court action.

The question presented in this regard is whether this Court should entertain this proceeding brought under the following circumstances:

1. The plaintiffs candidly admit that they were not only forum shopping, they were judge shopping. During one argument, plaintiffs' counsel also stated, in substance, that he entertained little hope that the state court would pay attention to his case.

2. An action against the same defendants or their predecessors in office was commenced by Order to Show Cause in the Supreme Court of the State of New York, New York County, in March 1983 (approximately twenty-one months ago) seeking the same relief and relying upon the same federal and state statutes. Although the named plaintiffs are not identical, since class certification is sought in both actions and the plaintiffs named here would be embraced by the class should it be certified by the state court, to place undue emphasis upon the absence of plaintiff identity would exalt form over substance.

3. An appeal from the state court rulings is presently pending in the Appellate Division, First Department.

4. Extensive papers were submitted to the state court on June 8, 1983 incident to the plaintiffs' application there for a preliminary injunction, which included affidavits of executives of City agencies which administer the City's shelter program and briefs on the legal entitlement to shelter.

5. The state action has already involved substantial pretrial practice including five depositions of City officials concerning the City's policies and practices of aiding homeless families.

6. Plaintiffs' counsel sought a temporary restraining order in the State Supreme Court on September 20, 1984 on behalf of Teresa Rodriguez, named as plaintiff here, which was denied by a justice of that court who made her motion to intervene in the state action returnable on September 25, 1984. On September 24, 1984, the proceeding on behalf of Ms. Rodriguez was withdrawn and the proceeding in this Court was commenced the same afternoon.

"Considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation'" *Colorado River Water Cons. Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976) would dictate an answer in the affirmative. *See also Northeast Mines, Inc. v. Town of Smithtown,* 584 F.Supp. 112 (E.D.N.Y.1984); *Moos v. Wells,* 585 F.Supp. 1348 (S.D.N.Y.1984).

Without intending to suggest that the traditional abstention categories [11] are not applicable, the discussion that follows will be limited to what has been referred to as "a fourth type of abstention" on the ground that duplicative litigation should be avoided. *See* 17 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4247.

**11.** The three general categories into which the abstention cases fall, as classified by the Court in *Colorado River Water Cons. Dist. v. United States,* 424 U.S. 800, 814–816, 96 S.Ct. 1236, 1244–1245, 47 L.Ed.2d 483 (1976) are: (1) "cases presenting a federal constitutional issue which might be rooted or presented in a different posture by a state court determination of pertinent state law." This category is often referred to as "Pullman abstention" from *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); (2) cases in which "there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." This category is often referred to as "Burford abstention" from *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); (3) cases in which "absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings, state nuisance proceedings antecedent to a criminal prosecution, which are directed at obtaining the closure of places exhibiting obscene films, ... or collection of state taxes." This category is often referred to as "Younger abstention" from *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

■ It is not disputed that a federal district court is obligated to adjudicate a controversy properly before it and abdication of that obligation can be justified only in those exceptional circumstances where important countervailing interests would clearly be served. It is also undisputed that as a general rule, as between state and federal courts, the pendency of an action in the state court is no bar to proceedings concerning the same matter in the federal court having jurisdiction. "The circumstances permitting dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention." 424 U.S. 800 at 817–18, 96 S.Ct. at 1246–47.

The *Colorado River* Court then proceeded to describe the factors relevant to a determination that exceptional circumstances exist and after describing them said that "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required.... Only the clearest of justifications will warrant dismissal." 424 U.S. 800, 818–19, 96 S.Ct. 1236, 1246–47.

The decision in *Colorado River* was carefully reviewed some seven years later in *Cone* and the court cautioned against a mechanical application of the exceptional circumstance factors. Those factors, said the court, were to be carefully balanced in any given case with the balance weighted heavily in favor of the federal court exercising jurisdiction.

One of the exceptional circumstances factors is the order in which jurisdiction was obtained by the concurrent forums. It is that factor which is especially significant in this case. The court in *Cone* made these observations with regard to that factor:

[T]his factor ... is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand. Thus, priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions. *Colorado River* illustrates this point well. There, the federal suit was actually filed first. Nevertheless, we pointed out as a factor favoring dismissal 'the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior to the motion to dismiss' ... Here, the opposite was true. It was the state court suit in which no substantial proceedings (excepting only the abortive temporary injunction) had taken place at the time of the decision to stay. In the federal suit, by contrast, the parties had taken most of the steps necessary to a resolution of the arbitrability issue. In realistic terms, the federal suit was running well ahead of the state suit at the very time that the District Court refused to adjudicate the case.

460 U.S. 1 at 21–22, 103 S.Ct. at 940.

These factors and the foregoing observation by the Court are precisely applicable here. Measuring priority not by which complaint was filed first but by how much progress has been made in the two actions, priority should clearly be given to the state court suit.

■ Some of the other factors in *Colorado River* which supported dismissal by the district court in that case are also present here. There are, for example, extensive rights governed by state statutes and similar suits have been litigated in state court. In addition to *McCain v. Koch*, No. 41023/83, the pending state court suit presenting the identical questions, *see Callahan v. Carey*, N.Y.L.J. Dec. 11, 1979, p. 10, col. 5, and *Eldridge v. Koch*, 118 Misc.2d 163, 459 N.Y.S.2d 961 (Sup.Ct.N.Y. Co.), *rev'd* 98 A.D.2d 675, 469 N.Y.S.2d 744 (1st Dep't 1983). It should be noted in passing that the state law issue, that is, the legal obligation of the defendants to provide emergency shelter, is as yet undecided by the state courts. In *Callahan*, the court granted a preliminary injunction requiring that 750 beds be provided to homeless men. A consent decree explicitly neg-

ating a finding of liability was thereafter entered. The granting of a preliminary injunction is not a determination on the merits and does not invoke the doctrines of res judicata or law of the case. D. Siegel, New York Practice, § 328 at 401 (1978).

It is true that the court in *Koster v. Webb*, 598 F.Supp. 1134 (E.D.N.Y.1983) denied the county defendants' motion to dismiss the complaint made pursuant to Rule 12(b)(6) of the Fed.R.Civ.P. In doing so, the same New York statutes that are in issue here were construed. The question of abstention was not raised and was, therefore, not before the court. This Court's construction of the New York statutes does not alter the fact that the issue is as yet undecided by New York courts. In this regard, it is proper to recall the words of Justice Frankfurter in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 499–500, 67 S.Ct. 643, 644–645, 85 L.Ed. 971.

> The lower court did deny that the Texas statutes sustained the Commission's assertion of power. And this represents the view of an able and experienced circuit judge of the circuit which includes Texas and of two capable district judges trained in Texas law. Had we or they no choice in the matter but to decide what is the law of the state, we should hesitate long before rejecting their forecast of Texas law. But no matter how seasoned the judgment of the district court may be, it cannot escape being a forecast rather than a determination. The last word on the meaning of ... the Texas Civil Statutes ... belongs neither to us nor to the district court but to the Supreme Court of Texas. In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication .... The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court.
> An appeal to the chancellor ... is an appeal to the 'exercise of the sound discretion, which guides the determination

of courts of equity.'... The history of equity jurisdiction is the history of regard for public consequences in employing the extraordinary remedy of the injunction.... Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies....

*Conclusion*

For the reasons set forth above, defendants' motions to transfer this action to the Southern District of New York are granted pursuant to 28 U.S.C. § 1406(a).