Daisy CANADAY, Lucy Roman, Melinda Panell, Teresa Rodriguez and Rebecca Booker, on behalf of themselves and their children and other dependent minors in their care, and on behalf of all others similarly situated, and the Coalition For the Homeless, Plaintiffs,

v.

Edward I. KOCH, as Mayor of the City of New York, George Gross, as Acting Commissioner of the New York City Human Resources Administration, and Cesar A. Perales, as Commissioner of the New York State Department of Social Services, Defendants.

No. 84 CIV.9280 (PKL).

United States District Court,
S.D. New York.

May 10, 1985.

Robert M. Hayes, Coalition for the Homeless, New York City, Paul, Weiss, Rifkind, Wharton & Garrison (Anne Louise Oates, New York City, of counsel), for plaintiffs.

Washington Square Legal Services, Inc., New York City, for plaintiffs.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City (Lillian Cohen, New York City, of counsel), for defendant Perales.

Frederick A.O. Schwarz, Jr., Corp. Counsel, New York City (Antonia Levine, Susan D. Wagner, New York City, of counsel), for defendants Koch and Gross.

## OPINION

LEISURE, District Judge:

This case was filed on September 24, 1984, in the Eastern District of New York. After the case was assigned to Judge I. Leo Glasser, defendants moved for an order transferring venue to the Southern District of New York, or in the alternative, staying further proceedings in this case pending resolution of a parallel proceeding in Supreme Court, New York County, entitled *McCain, et al. v. Koch, et al.*, 484 N.Y.S.2d 985 (1984). On December 17, Judge Glasser granted the motion to transfer venue to this District, *Canaday v. Koch*, 598 F.Supp. 1139 (E.D.N.Y.1984). Upon the case's transfer here, defendants indicated they would renew their abstention motion. It is that motion that is now before me.

### I. FACTUAL BACKGROUND.

The New York City Human Resources Administration ("HRA"), of which defendant Gross is Acting Commissioner, operates a large number of Income Maintenance Centers ("IMC"), which are located throughout the City. Homeless families

may come to their local IMC for placement in emergency shelter. The IMC will either place a family in emergency housing, or send the family to an Emergency Assistance Unit ("EAU") for referral to shelter. There is an EAU in each of the City's boroughs except Staten Island. EAUs provide services after 5:00 P.M. on weekdays and on weekends and holidays, when IMCs are closed.

Plaintiffs Canaday, Roman, Panell, Rodriguez and Booker are homeless mothers who claim to have been denied "lawful emergency housing" by the defendants.[1] According to the complaint, they have had to wait, with their children, in EAUs until the early morning hours before emergency housing was provided to them, and are in danger of further denials of emergency shelter. Their complaint makes three requests of the Court. First, plaintiffs request that they be certified, pursuant to Fed.R.Civ.P. 23, as representatives of the class of all homeless families in New York City that have been, are being or will be denied emergency shelter by defendants. Second, they seek a declaration that defendants' failure to provide plaintiffs with "lawful emergency housing" violates federal and state constitutional, statutory and regulatory law. And they ask the Court to issue an injunction requiring defendants "to provide lawful emergency housing to meet the needs of plaintiffs."

Plaintiffs have asserted in their complaint three claims to support the relief they seek. The first rests on the maze of federal and state statutes and regulations governing emergency aid to needy families with children. The second arises from the consent judgment agreed to by the City and State in *Callahan, et al. v. Carey, et al.*, Index No. 42582/79 (Sup.Ct.N.Y.Co.) on August 26, 1981. By that judgment, defendants obligated themselves to provide emergency housing to homeless men. In *Eldredge v. Koch,* 118 Misc.2d 163, 459 N.Y.S.2d 960 (Sup.Ct.N.Y.Co.), *rev'd on other grounds,* 98 A.D.2d 675, 469 N.Y. S.2d 744 (1983) the court held that under the equal protection clause equivalent facilities must be made available to homeless women as well. Plaintiffs here contend that the equal protection clause mandates that emergency shelter be provided to homeless families on the same basis as it is provided to homeless single persons. Their third claim is based on Article XVII § 1 of the New York State Constitution[2] and numerous provisions of the New York Social Services Law. Each of these claims for relief is raised in *McCain.*

With this general background, I turn to the history of this litigation and the parallel state litigation.

*McCain v. Koch* was commenced in Supreme Court, New York County, by order to show cause, on March 31, 1983. Fourteen named homeless plaintiffs sued Koch, Perales, then-Commissioner of HRA Krauskopf, and numerous other governmental officials. They sought class certification and a preliminary injunction ordering a complete overhaul of the City's system for providing emergency shelter to homeless families. As part of the requested provisional relief, they sought an order "locating and making available additional emergency housing units within New York City so that all families with children in need of emergency housing can immediately obtain such housing in New York City." (Exhibit C to Opposition Affidavit of Antonia Le-

---

1. Plaintiff Coalition for the Homeless is a not-for-profit corporation that assists in enforcing the rights of the homeless poor.

   Defendants herein are sued in their official capacities. Edward I. Koch, as Mayor of the City of New York, allegedly has ultimate charge of the City's emergency shelter program. George Gross is Acting Commissioner of HRA, which administers the emergency assistance. Cesar A. Perales is Commissioner of the New York State Department of Social Services

("DSS"). In that capacity he is allegedly responsible for administering all public assistance programs in the State, including emergency aid to needy families with children.

2. Article XVII § 1 provides as follows:

   The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine.

vine). That relief—creation of additional emergency shelter capacity—is identical to the relief sought in this federal suit. The *McCain* complaint, however, is far broader in scope than this suit. The amended complaint dated May 1, 1983 raises claims going to: insufficient provision of shelter for homeless families; the type of facilities to be included in any shelter provided; the location and condition of such shelters; the system for informing homeless families of services available to them; the methods for determining eligibility of homeless families for certain public assistance benefits; denial of those benefits to homeless families; and sundry other claims of procedural and substantive defaults by the City and State in providing emergency housing and certain other public assistance benefits to homeless families.

In May, 1983, numerous persons attempted, by way of order to show cause accompanied by requests for preliminary injunctions, to intervene in *McCain*. Their claims also went to the adequacy of the City's system for providing emergency shelter.

All sides submitted briefs on the preliminary injunction, class certification and intervention motions by June 8, 1983. Defendants opposed each motion. Their main argument was that as a matter of legal obligation, their duty to the needy goes no further than provision of cash grants. Actual provision of shelter, in their view, is a matter of grace. They opposed class certification and intervention on grounds, *inter alia*, that it was unnecessary since the requested relief—creation of sufficient additional shelter capacity to house all families in need of emergency shelter—would in any event benefit all conceivable intervenors and class members, without the unwieldiness of a class action. Plaintiffs argued that by including "securing family shelter" among the services to be provided, the state's aid plan explicitly requires provision by the City and State of emergency shelter to the homeless.

Justice Greenfield issued his ruling on the motions on June 22, 1984. He denied certification of a class on grounds that "the numerous questions of fact and law [raised in the case] are not common to all members [of the class of homeless families]." He made final his June, 1983 interim order. His June 1984 order is not, however, without its ambiguities, particularly on the issue of whether defendants have a substantive duty to provide emergency shelter to all homeless families. He did reject plaintiffs' argument that the State Constitution and various State statutes explicitly mandate that shelter be provided. However, he also expressed unhappiness with defendants' position that state law imposed on them no obligation beyond provision of cash grants. It is clear, however, that the preliminary relief plaintiffs requested was denied. Thus, Justice Greenfield appears to have decided either that plaintiffs' arguments lacked merit, or at most, that if defendants are under any obligation at all under state law actually to provide shelter, that duty is not *explicitly* spelled out, but must somehow be inferred.

Neither side was happy with Justice Greenfield's ruling; both have appealed to the First Department. Plaintiffs' appeal challenges the order to the extent it denied the requested preliminary injunction, class certification and intervention. Defendants have appealed his rulings directing compliance with certain minimum standards in any housing that was provided and mandating that certain procedural safeguards be followed. The appeals will be heard by the Appellate Division, First Department, in its September term.

In May and July, 1984, more persons attempted to intervene in *McCain*. They sought class certification and requested that certain mass shelters in which families were placed be closed and their occupants placed in hotels and motels. On August 6, Justice Greenfield denied their motions. He refused to order the mass shelters closed, and denied class certification on grounds that "[r]elief sought by the class action is the same as requested by the preliminary injunction, the closing of mass shelters." The intervention motions were

denied as well, with the comment, "[t]his court has repeatedly stressed that it is unable to determine individual factual situations." [3]

Shortly before the instant litigation was commenced, one of the plaintiffs herein, Teresa Rodriguez, sought to intervene in *McCain*. She sought a temporary restraining order and preliminary injunction to prevent defendants from denying emergency shelter to homeless families, the same relief requested herein. On September 20, 1984 Justice Jawn Sandifer heard the TRO motion, Justice Greenfield having declined to hear it. Justice Sandifer denied the TRO, and the motion for a preliminary injunction was made returnable for September 25. On September 24, Rodriguez withdrew the motion, and that afternoon filed this suit in the Eastern District of New York with her co-plaintiffs.

Plaintiffs commenced this action with an order to show cause for a preliminary injunction and class certification. When the case was filed, plaintiffs' counsel asserted that it was related to *Koster v. Webb*, 598 F.Supp. 1134,[4] which was then pending in the Eastern District before Judge I. Leo Glasser. Accordingly, under Local Rule 3, *Canaday v. Koch* was assigned to Judge Glasser.

That evening, counsel for all parties appeared before Judge Glasser, who, after hearing argument, decided to permit defendants to proceed first, with alternative motions addressed to improper venue and abstention. He held plaintiffs' preliminary injunction and class certification motions in abeyance pending decision on defendants' motion, which was made returnable on October 3.

On December 17, Judge Glasser granted defendants' motion to transfer venue to the Southern District of New York. *Canaday v. Koch*, 598 F.Supp. 1139 (E.D.N.Y.1984). He saw fit, however, to add a lengthy dictum on abstention. In commenting that "[h]ad I concluded that venue was properly laid in this district, I would nevertheless have stayed this proceeding pending the disposition of the state court action [in *McCain* ]," he noted the peculiar circumstances of the *Canaday* litigation. Plaintiffs admitted at oral argument that they were "not only forum shopping, they were judge shopping." *Id.*, at 1149. He noted the extensive, voluminous briefs and affidavits submitted in the *McCain* motions on legal entitlement to shelter, and observed that except for Justice Greenfield's order, which was being appealed, the New York courts had never directly ruled on the issue. Finally, he called into question his own thirteen-month-old ruling in *Koster v. Webb*, in which he had held that allegations similar to those made here state a cause of action: "This Court's construction of the New York statutes does not alter the fact that the issue is as yet undecided by New York courts." *Id.*, at 1151.

This case was assigned to me after its transfer to this District. At my first conference with the attorneys on February 22, 1985, defendants indicated they would renew their motion to dismiss or stay this action on abstention grounds. I set a schedule for the submission of papers. Before the motion was fully submitted, however, numerous persons brought a motion by way of order to show cause seeking intervention as plaintiffs, class certification, and a preliminary injunction preventing defendants from denying emergency housing to homeless families.[5] They also requested that I issue a temporary restraining order provisionally granting their requested relief during the pendency of the

---

**3.** Plaintiffs in *McCain* have appealed this order.

**4.** In *Koster v. Webb*, 598 F.Supp. 1134 (E.D.N.Y. 1983), plaintiffs were homeless residents of Nassau County. They sued under the same provisions of Federal and State law as plaintiffs herein sue, and sought identical declaratory and injunctive relief. On November 9, 1983, Judge Glasser denied defendants' motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(6). He held that plaintiffs had stated a claim under the Social Security Act, 42 U.S.C. §§ 601 *et seq.* (1982) and under the New York Social Services Law.

**5.** The proposed intervenors are represented by the same counsel as plaintiffs Canaday, *et al.*

motion. On April 17, the parties appeared before me and I denied plaintiffs' application for a TRO. In light of plaintiffs' urgent request for a preliminary injunction, however, I stated that the abstention motion would be decided forthwith, followed by prompt decision of the preliminary injunction motion. I set a tentative return date of May 6 for the preliminary injunction motion, to be effective if defendants' abstention motion was denied. On April 24, two days after the abstention motion was fully submitted, I issued a one-page order granting defendants' motion to stay this case pending resolution of *McCain*.[6] As indicated, this opinion is being issued to explain that order.

## II. DISCUSSION.

■ As a general rule, the federal courts are under a "virtually unflagging obligation ... to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). Koch and Gross (the "City defendants") and Perales argue that the instant case is one of those exceptional cases where the district court should decline to decide a dispute properly before it. They rely primarily on the "wise judicial administration" exception expounded in *Colorado River, supra*, and *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), but contend that the result they desire would be justified also under the abstention doctrines of *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) and *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). I will deal with each separately.

**A. Pullman *abstention*.**

■ Defendants argue that because of the lack of clarity of the state law sources on which plaintiffs ground their claims, I should abstain from deciding this case, and leave to New York's courts the task of interpreting New York law. The *Pullman* doctrine permits a federal court to abstain "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959), quoted in *Colorado River*, 424 U.S. at 814, 96 S.Ct. at 1244. In such cases, a court may "avoid[ ] a federal constitutional issue by seeking a state determination of state law." *Giardina v. Fontana*, 733 F.2d 1047, 1052 n. 1 (2d Cir.1984).

Contrary to plaintiffs' protestations, the state law issues presented in this case are far from clear. Whether the New York Constitution or the New York Social Services Law bind the State and local governments actually to provide shelter for homeless persons has been addressed three times: in *Callahan v. Carey*, N.Y.L.J., Dec. 11, 1979, at 10, col. 5 (Sup.Ct.N.Y.Co.); in *Koster v. Webb, supra* note 4; and in *McCain*. The results of these cases appear to be in conflict and in any event are less than authoritative.

*Callahan* was a suit on behalf of "all destitute homeless derelicts roaming the neighborhood of the Bowery." The reported opinion granted plaintiffs' application for a temporary mandatory injunction directing state and local government officers to provide shelter for all the plaintiffs, relying on many of the same state law provisions relied on by plaintiffs in the instant case.[7] In *Koster*, Judge Glasser held that plaintiffs, homeless residents of

---

**6.** The order reads, in its entirety, as follows.
Defendants' motion to stay this action pending resolution of proceedings in *McCain, et al. v. Koch, et al.*, [484 N.Y.S.2d 985] (Sup.Ct.N.Y. Co. [1984] ), is hereby granted. Accordingly, the motions of the proposed plaintiff-intervenors are moot.

An opinion will follow in short order.

**7.** *Callahan* ultimately terminated with a consent judgment by which City and State officials agreed, without admitting liability or obligation, to provide housing to homeless men.

Nassau County, had sufficiently stated a claim for relief to withstand a motion to dismiss under Fed.R.Civ.P. 12(b)(6). The claims in *Koster* were based on the same legal provisions, state and federal, as are the claims in this case. But in *McCain*, as recounted *supra*, Justice Greenfield denied plaintiff's application for a preliminary injunction that would have ordered defendants to provide shelter to all homeless families, though it is unclear whether or not he dismissed plaintiffs' arguments out-of-hand. *See supra* pp. 1464–1465.

It is apparent, then, that the New York law in question here is quite far from having·reached the stage of black letter. Indeed, quite the opposite is true: the law is unsettled. Even the cases that seem to support plaintiffs' position are a good deal less than ironclad. The *Callahan* opinion granting the temporary injunction was issued on the eve of winter's onset, and clearly was motivated by the court's emphasized concern regarding the likelihood of a large number of deaths from hypothermia, a situation not presented here. Moreover, as Judge Glasser noted in his opinion transferring this case to this District, under New York law, grant of a preliminary injunction "is not a determination on the merits and does not invoke the doctrines of res judicata or law of the case." *Canaday, supra*, at 1151. So *Callahan* is of minor value as persuasive authority. *Koster*, too, is less than authoritative. Judge Glasser himself recognized this in *dictum* in his opinion in *Canaday*.[8] It is thus quite obvious that the meaning of the pertinent provisions of New York law is unsettled.

In this case, decision of the state law question may well avoid the necessity of reaching the federal constitutional issue raised by plaintiffs. If plaintiffs were to be granted the relief they seek on the strength of their state law claims alone,

their fourteenth amendment claim would be mooted.

Contrary to defendants' arguments, however, this state of affairs does not merit *Pullman* abstention. The Second Circuit's test for *Pullman* abstention requires more than that resolution of the state law issue may avoid the federal constitutional question.

In general, the three essential conditions for invocation of the doctrine of [*Pullman* ] abstention are that the state statute be unclear or the issue of state law be uncertain, that resolution of the federal issue depend upon the interpretation to be given to the state law, and that the state law be susceptible of an interpretation that would avoid or modify the federal constitutional issue.

*McRedmond v. Wilson*, 533 F.2d 757, 761 (2d Cir.1976) (citations omitted). *See also West v. Village of Morrisville*, 728 F.2d 130, 133–34 (2d Cir.1984); *Winters v. Lavine*, 574 F.2d 46, 69 (2d Cir.1978). Clearly, the first and third elements—unclear state law and possible avoidance of a federal constitutional question—are met here, as elaborated above. But the second plainly is not. It requires that the constitutional issue be logically dependent on resolution of the state law issue, and no such logical dependency exists in this case. Whether plaintiffs were denied equal protection of the laws is a question that may be decided independently of any decision as to plaintiffs' rights under state law. It is not logically necessary to decide the state law issues first, before reaching the constitutional claim; the constitutional claim is alternative to, rather than dependent upon, the state law claims. Since the state law issues are not logically preliminary to the federal constitutional issue, the second element of the Second Circuit's test for abstention is missing, and *Pullman* abstention is therefore inapplicable.[9]

---

**8.** Noting that abstention would be appropriate, Judge Glasser declared that "[t]his Court's construction of the New York statutes [in *Koster* ] does not alter the fact that the issue is as yet undecided by New York courts." *Canaday*, at 1151.

**9.** Plaintiffs have argued that the presence of their claim under the Social Security Act, 42 U.S.C. §§ 601 *et seq.*, itself mandates that I not abstain. I do not agree. As I will discuss later, *infra* notes 19–22 and accompanying text, the asserted federal statutory claim, if valid, is logi-

## B. Burford *abstention.* [10]

■ *Burford* abstention is a consequence of the federalist principle of comity between state and federal sovereignties. In a nutshell, this brand of abstention permits federal courts to exercise their discretion to refrain from interfering with state policymaking and enforcement efforts in complex areas which are primarily of state concern and prerogative.

[*Burford* a]bstention is ... appropriate where there have been presented difficult questions of state law bearing on problems of substantial public import whose importance transcends the result in the case then at bar. *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 [79 S.Ct. 1070, 3 L.Ed.2d 1058] (1959) .... See also *Kaiser Steel Corp. v. W.S. Ranch Co.*, 391 U.S. 593 [88 S.Ct. 1753, 20 L.Ed.2d 835] (1968); *Hawks v. Hamill*, 288 U.S. 52 [53 S.Ct. 240, 77 L.Ed. 610] (1933). In some cases, however, the state question itself need not be determinative of state policy. It is enough that exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public

concern.... *Burford v. Sun Oil Co.*, 319 U.S. 315 [63 S.Ct. 1098, 87 L.Ed. 1424] (1943).

*Colorado River*, 424 U.S. at 814, 96 S.Ct. at 1244.

■ If the state law issues presented by the case are not unclear, the federal court should not abstain, *see, e.g., Board of Educ. v. Bosworth*, 713 F.2d 1316, 1320 (7th Cir.1983); *Naylor v. Case and McGrath, Inc.*, 585 F.2d 557, 565 (2d Cir. 1978) (abstention is inappropriate where state law is clear so that risk of disrupting development of state law is minimal). Unclear state law, however, is a compelling factor in favor of abstention when the issues pertain to matters of predominantly local concern. *See Grossman v. Axelrod*, 466 F.Supp. 770, 779 (S.D.N.Y.1979), *aff'd*, 646 F.2d 768 (2d Cir.1981).[11] In exercising its discretion as to whether to abstain, a court should also consider the impact a decision would have on state programs. If the federal court's ruling could have "broad impact on state policy," *Smith v. Metropolitan Prop. & Liab. Ins. Co.*, 629 F.2d 757, 760 (2d Cir.1980), then abstention may be proper.[12] The basic premise of *Burford* is to preserve federal-state comity

cally dependent on a preliminary resolution of unsettled law.

**10.** *"Burford* abstention" is used here as shorthand for the doctrine which emanates from *Burford, Thibodaux, Kaiser Steel,* and the other cases cited in the portion quoted below from *Colorado River.* It is not a cleanly defined doctrine, and appears to rest on a number of different factors. As is illuminated below, these factors include the stage of development and lack of clarity of the pertinent state law, the existence *vel non* of a structured state regulatory or administrative apparatus, the acuteness of the state's interest in the subject, the complexity of the underlying problem which the state law addresses, and whether the state has made provision for specific methods of obtaining judicial review of questions in the area.

One commentator has treated *Burford* and *Thibodaux* as distinct abstention doctrines. *See* Field, *Abstention in Constitutional Cases: The Scope of the* Pullman *Abstention Doctrine,* 122 U.Pa.L.Rev. 1071, 1148–63 (1974). On non-*Pullman* abstention, *see generally* Hart & Wechsler, Federal Courts and Federal Jurisdiction 994– 1005 (2d ed. 1973).

**11.** Unclear state law *alone* is not a sufficient reason to abstain. Other factors indicating "exceptional" circumstances which would warrant abstention must be present. *Meredith v. Winter Haven,* 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943).

**12.** Indeed, in *Smith,* the Second Circuit held that the presence of these two factors, unsettled state law and wide ramifications for state policy, alone is sufficient for the court to abstain under *Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959), cited *supra,* text following note 10. *Smith,* 629 F.2d at 760.

While *Smith* was a declaratory judgment action, so that federal jurisdiction there was discretionary, that fact does not seem related to the *Smith* court's explanation of *Thibodaux.* In fact, the declaratory judgment appears not to have been the driving force behind the Second Circuit's reasoning in support of abstention in that case. Its reasoning would have supported abstention under *Thibodaux* even if jurisdiction had not been discretionary.

by not interfering with state attempts to develop, effect and/or enforce state policy, *see, e.g., Hawks v. Hamill,* 288 U.S. 52, 53 S.Ct. 240, 77 L.Ed. 610 (1933). Particularly in cases where a ruling would have wide-ranging effect on what are essentially state and local affairs, federal judiciary intervention would be "inimical to harmonious federalism." *Smith,* 629 F.2d at 759. *See also Kaiser Steel Corp. v. W.S. Ranch Co.,* 391 U.S. 593, 594, 88 S.Ct. 1753, 1754, 20 L.Ed.2d 835 (1968); *Grossman v. Axelrod,* 466 F.Supp. 770, 779 (S.D.N.Y.1979), *aff'd,* 646 F.2d 768 (2d Cir.1981).

■ Further factors are necessary as well. One is the importance to the state or political subdivision of the subject matter of the action. For example, in New Mexico, cases presenting questions of access to water are of intense local interest and of predominantly local concern. Abstention is warranted in such cases. *Kaiser Steel, supra.* The same may be said of disputes raising issues concerning: intrastate transportation facilities, *Alabama Pub. Serv. Comm'n v. Southern Ry. Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); local regulation of landlord-tenant relations, *Moos v. Wells,* 585 F.Supp. 1348 (S.D. N.Y.1984); *Jaffe v. Clarke,* 566 F.Supp. 1500 (S.D.N.Y.1983), *aff'd mem.,* 742 F.2d 1436 (2d Cir.1984); state control of important natural resources, *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) (oil in Texas); zoning and land use, *Ad + Soil Servs., Inc. v. Board of County Comm'rs,* 596 F.Supp. 1139 (D.Md. 1984); *Northeast Mines, Inc. v. Town of Smithtown,* 584 F.Supp. 112, 114–15 (E.D. N.Y.1984); heavily regulated local industry, *Smith, supra,* (insurance); *Levy v. Lewis,* 635 F.2d 960, 963–64 (2d Cir.1980) (insurance); or state trade regulation, *Naylor, supra* (Connecticut Unfair Trade Practices Act). In such matters of peculiarly local concern, "proceedings in the federal courts are likely to add little to, or even detract from," state efforts to coherently deal with the issues. *Jaffe v. Clarke,* 566 F.Supp. at 1501. *See also Thibodaux,* 360

U.S. at 29, 79 S.Ct. at 1073 ("special nature of eminent domain justifies [abstention] ").

Another important consideration is the manner in which the state has chosen to deal with the problem presented. Existence of a comprehensive system of state administrative decisionmaking with specified channels of judicial review is important to a federal court in deciding to abstain under *Burford.* A specialized review apparatus assures adequate protection of the parties' rights and attention to the matter by an expert tribunal. *See Burford,* 319 U.S. at 333, 63 S.Ct. at 1107.

■ That a case presents a federal constitutional issue does not prevent the federal court from choosing to abstain, though such an issue is a factor in favor of exercising jurisdiction. *See Colorado River,* 424 U.S. at 815 n. 21, 96 S.Ct. at 1245 n. 21. *Burford* itself presented a constitutional question, as did *Alabama Pub. Serv. Comm'n, supra,* yet the Supreme Court nevertheless held abstention to be appropriate in those cases. So a constitutional claim does not necessarily bar abstention. This is not to deny the continuing federal interest in protecting federal rights in the federal courts. But abstention does not mean that the federal courts turn their backs on issues of federal interest. It means only that in the particular case it is more appropriate that the federal rights be safeguarded by proper adjudication in the state system. The state decisionmakers are constitutionally bound to apply federal law where appropriate, and federal review remains available, by appeal to the United States Supreme Court from decision of the state's highest court. *See Burford,* 319 U.S. at 333, 63 S.Ct. at 1107.

■ It is abundantly clear to me that the issues presented in this case should be decided by state decisionmakers. The problem of New York City's homeless is one of predominantly local concern. State law regarding governmental obligations to the destitute homeless is unsettled and unclear.[13] Local officials are still endeavor-

---

13. *See supra* Part II. A.

ing to formulate and effect a coherent policy for providing shelter for the homeless.[14] Obviously, federal court intervention in this area would interfere with those efforts. Allocation of resources for welfare programs is a task uniquely within the sphere of local control.[15] Placing that task under the supervision of this Court is a course frought with dangers. This Court has no particular expertise in structuring welfare programs, or allocating scarce resources among competing needs. Nor is it on familiar terms with the state and local political and procedural apparatus which could come under its receivership were it to proceed with deciding this case. Nor does it have the familiarity with state law that is indispensable to adequate decision of this wrenching problem. For the federal court to thrust itself into this area and dictate to state and local officials its view of the proper way to discharge their official duties can hardly be conducive to harmonious federalism.[16]

The questions presented herein would better be decided in the state system. The state has constructed a complex system of administrative review and appeal, see N.Y. Soc.Serv.L. § 22 (McKinney 1983), and has specified a method of judicial review by way of proceedings in New York Supreme Court under CPLR Article 78. I am reluctant to intrude on this system. My reluctance is magnified in this case by indications that plaintiffs' attorneys are engaging in forum shopping and attempts to avoid going through normal state channels.

As was noted above, the presence of a federal constitutional question will not in and of itself prevent abstention. Plaintiffs contend, however, that abstention is improper in this case because they have presented a federal statutory claim as well, under 42 U.S.C. §§ 601 et seq.[17] A close examination of plaintiffs' claim, however, reveals that if there is in fact a federal statutory claim here at all, it is so inter-

---

**14.** One recent article from the local press illustrates the City's struggle to formulate a coherent policy in this area.

### City Is Planning
### To Add Housing
### For Its Homeless
*Would Allot $35 Million*
*for 4,000 New Units*

Mayor Koch will abide by his promise to provide 4,000 more permanent apartments for homeless families, even though outside financing is not available, city officials said yesterday.

The city had planned to use $35 million in increased payments from the Port Authority of New York and New Jersey, in place of taxes on the World Trade Center, to rehabilitate dilapidated city buildings for homeless families.

Because there is no agreement on the payments, the officials said, Mr. Koch would provide $35 million from the city's capital budget for the construction.

Deputy Mayor Robert Esnard said he was still hoping to reach an agreement with Governor Cuomo and Port Authority officials on a joint program in the next few weeks. If an accord is reached, he said, the city would use the money to add 1,000 units to the program, bringing the expansion to 5,000 units. There are now 4,200 units for homeless families.

. . . .

### 'Basically a Rehash'
*City Council President Carol Bellamy has opposed efforts to expand temporary shelters for the homeless. She favors setting aside the*

*money for permanent housing.* An aide to Miss Bellamy, Cindy Freidmutter, said Mr. Koch's program was "basically a rehash" of proposals he had made before.

The city officials said Mr. Koch's budget would add $27 million in city, state and Federal money to the $173 million now spent on the homeless. The addition would include $500,000 to buy 1,000 refrigerators for families in hotels. There are now 200.

In addition, the budget calls for expanding recreation programs, hot meals and employment programs for homeless families in hotels.

The officials projected that the number of homeless families would increase 800, to 4,200, next year and that the peak number of homeless people, during cold weather, would rise, from 7,600 to 9,000.

*N.Y. Times,* May 2, 1985, at B6 col. 1 (emphasis added).

**15.** Indeed, the federal government has stated its policy that such decisions remain at the local level. *See infra* note 20 and accompanying text.

**16.** This concern is especially pertinent in light of the Second Circuit's attitude toward abstention. *See Smith,* 629 F.2d at 760 ("This court has adopted a broad view of abstention.").

**17.** Claims under the Social Security Act are actionable under 42 U.S.C. § 1983. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

twined with unsettled questions of state law that sound discretion argues in favor of abstention.

In the Social Security Act, Congress created the Aid to Families with Dependent Children ("AFDC") program, 42 U.S.C. §§ 601 *et seq.* Part of a "scheme of cooperative federalism," *King v. Smith,* 392 U.S. 309, 316, 88 S.Ct. 2128, 2135, 20 L.Ed.2d 1118 (1968), it is essentially a funding program. Any state that wishes to receive federal funding may participate. To receive federal funds, the state's welfare plan must comply with certain mandatory conditions, 42 U.S.C. § 602(a), and the plan must be submitted to the Secretary of Health and Human Services, who will approve the plan if it complies with the mandatory conditions. 42 U.S.C. § 602(b). The mandatory conditions deal mainly with administration of the plan, though certain of the provisions place substantive obligations upon the participating state.[18] Congress left substantial discretion to the states, though. States determine the standard of need and the level of benefits. Congress was careful to leave it to the states to fashion their assistance programs in the manner best suited to local needs, consistent with federally prescribed requirements. *See* 42 U.S.C. § 601 (AFDC program established to provide assistance "as far as practicable under the conditions in such state"); *New York State Dep't of Soc. Servs. v. Dublino,* 413 U.S. 405, 414, 93 S.Ct. 2507, 2513, 37 L.Ed.2d 688 (1973); *Rosado v. Wyman,* 397 U.S. 397, 408, 90 S.Ct. 1207, 1215, 25 L.Ed.2d 442 (1970); *Dandridge v. Williams,* 397 U.S. 471, 478, 90 S.Ct. 1153, 1158, 25 L.Ed.2d 491 (1970).

As part of the AFDC program, Congress provided for emergency assistance to needy families with children ("EA"). EA is a highly flexible program; states have discretion to both set eligibility criteria[19] and to determine what types of emergency assistance will be given. Indeed, Congress felt that giving the States a great deal of flexibility was the best way to assure that the goal of providing emergency assistance to needy families with children would be reached. *See Quern v. Mandley,* 436 U.S. 725, 744–45, 98 S.Ct. 2068, 2079–80, 56 L.Ed.2d 658 (1978). Congress intended that, while the federal government would provide monetary assistance to the states for purposes of AFDC and EA programs, the states would retain "meaningful fiscal [and] programmatic control." *Id.* at 746, 98 S.Ct. at 2080. To be sure, Congress attached strings to the federal funding, in order to insure that federal money was spent in accordance with federal policy. The inclusion of federal money in a state's welfare budget, however, does not make the welfare program into a federal program. In its essence, it is a state program, which the federal government funds if the program meets certain criteria.[20]

Federal judicial review in this area should take account of Congress's intent in setting up its AFDC and EA funding scheme. Of course, "[i]t is ... peculiarly part of the duty of [federal courts], no less in the welfare field than in other areas of the law, to resolve disputes as to whether federal funds allocated to the States are being expended in consonance with the conditions that Congress has attached to their use." *Rosado v. Wyman,* 397 U.S. at 422–23, 90 S.Ct. at 1223. If the state's program does conform to the minimum dictates of the federal funding legislation, though, the federal courts' role is different. Where not necessary to police state compliance with

---

**18.** *E.g.,* 42 U.S.C. § 602(a)(17) (state plan must include program for strengthening family life and reducing incidence of birth out of wedlock).

**19.** Of course, state decisions on eligibility must conform to the federally prescribed minimum, but beyond that minimum, the state has complete discretion. *See Blum v. Bacon,* 457 U.S. 132, 140, 102 S.Ct. 2355, 2360, 72 L.Ed.2d 728 (1982) (so long as federal regulation requiring that EA be available to AFDC recipients is complied with, state may fix eligibility standards for EA in any way it chooses).

**20.** *See Quern v. Mandley,* 436 U.S. at 745 & n. 21, 98 S.Ct. at 2079 & n. 21 (Supreme Court noted that because past experience had made it clear that the federal government could not effectively mandate programs in this area, Congress left ultimate decisionmaking authority to the states.)

federal funding conditions, "the federal courts should not interject themselves amidst the complications of state welfare administration unless expressly so directed by Congress." *Black v. Beame,* 550 F.2d 815 (2d Cir.1977).

The statutory claim in instant case appears to be no more than an assertion that Koch, Gross and Perales are violating state law. Clearly, the EA provision, 42 U.S.C. § 606(e), does not itself mandate that states participating in EA must actually provide emergency shelter. " 'States remain free, under Federal policy, to develop their own definition of the kind of emergencies they will meet under this program,' " *Blum v. Bacon,* 457 U.S. at 140, 102 S.Ct. at 2361 (quoting Office of Financial Assistance Action Transmittal addressed to state agencies). They also remain free to decide *how* they will deal with such emergencies. And while states must inform the Department of Health and Human Services of what services they have chosen to provide in their EA program, 45 C.F.R. § 233.120, the Department has issued no mandates as to the manner in which those services are to be provided or on what terms (though it does set a minimum eligible class of recipients, *see supra* note 19). Such matters are questions of state law.

Not only are they questions of state law, they are matters that Congress intended to be within the sphere of state discretion and thus not of federal concern. The federal policy expressed in the statute is to *refrain* from meddling in each state's attempts to fashion an EA program suited to its own particular needs and circumstances. *Quern v. Mandley,* 436 U.S. at 744–45, 98 S.Ct. at 2079–80. The federal interest is thus limited to insuring that the funds are properly spent, in conformity with the funding conditions. Beyond that, there appears to be little if any role for the federal courts in this area.

In the instant case, plaintiffs do not assert that New York's family emergency assistance scheme runs afoul of federal requirements. Rather, they argue as follows.[21] New York provided in 18 N.Y.C. R.R. § 372.4 that "securing family shelter" is among the EA services it will provide. The state is, in fact, obligated, by the state constitution and state statutes to provide emergency shelter to all destitute homeless families. When it filed its plan with the Department, New York included "securing family shelter" as one of the EA services the state provides. Thus, if New York fails to provide "lawful emergency shelter" as demanded by plaintiffs, it violates the Social Security Act.

Even were I to accept plaintiffs' proposition that defaults in state and local compliance with state laws governing public assistance are *ipso facto* violations of the federal statute under which the state program is funded, I nevertheless would abstain. For the determination of whether or not the Social Security Act is violated would necessarily depend on a preliminary determination of unsettled state law in an area of acutely local concern. It simply is not clear from present authorities what it is exactly that the state has obligated itself to provide in the way of emergency assistance. The precise contents of New York's EA program are dictated by state and local, rather than federal law. Moreover, caring for the poor is a matter of intense local concern. New York has provided a comprehensive system of administrative and judicial review. The state and local authorities are in the process of formulating ways to deal with the growing problem of homeless families. Federal court interference would obstruct that process. Therefore, to "avoid needless conflict with New York's administration of its [EA] system," *Grossman v. Axelrod,* 466 F.Supp. at 779, *Burford* abstention is amply warranted in this case.[22]

**21.** This summary of plaintiffs' legal argument is based on the brief submitted by them to Judge Glasser in support of their original motion for a preliminary injunction and class certification, filed in the Eastern District of New York on September 26, 1984.

**22.** The Medicaid program, 42 U.S.C. §§ 1396 *et seq.* is constructed in much the same way as the AFDC program. The federal statute sets the minimum conditions under which the federal government will fund a participating state's medical assistance program. Beyond the mandatory conditions, however, the states retain complete discretion in structuring their Medic-

## C. *Wise judicial administration:* Colorado River.

■ In *Colorado River*, the Supreme Court synthesized prior authority and announced a narrow exception to the duty of federal courts to exercise the jurisdiction granted to them. In the interests of "wise judicial administration," a federal court may sometimes decline to proceed with a case properly before it when a parallel litigation is pending in state court. Such a course is appropriate only upon "the clearest of justifications" after careful consideration of a number of factors. *Colorado River*, 424 U.S. at 817–19, 96 S.Ct. at 1246–47. No one factor is determinative, *id.* at 818, 96 S.Ct. at 1246, and the weight accorded to each factor varies from case to case, *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927, 937, 74 L.Ed.2d 765 (1982) [hereinafter "*Cone* "].

■ The first two factors, state court jurisdiction over property and the relative convenience of the two courts, enumerated by the Supreme Court in *Colorado River* clearly do not weigh against the exercise of jurisdiction in this case. Both this litigation and *McCain* are, in essence, statutory tort claims. As such, the actions are *in personam*, and there is no *res* which would be under the jurisdiction of either court. Nor is there any difference between the two courts in terms of the parties' convenience. Supreme Court, New York County and this Court are separated only by several yards.

The other factors listed in *Colorado River* and *Cone* and summarized by the Second Circuit in *Giardina v. Fontana*, 733 F.2d 1047, 1053 (2d Cir.1984), however, weigh heavily in favor of abstaining under *Colorado River*.

First, the *McCain* litigation has been in progress for over two years. Despite the constant drumbeat of motions the case is progressing. The trial court, after receiving voluminous submissions, has rendered a decision on plaintiffs' application for a preliminary injunction, which requested relief identical to that requested herein. That decision is now on appeal. So substantial progress has been made in *McCain*. By contrast, the *Canaday* litigation has not made any progress at all on substantive issues. Venue has been transferred to this District and there has been an abstention motion, but nothing at all has been done on the merits.[23] So the relative progress of the two cases is a factor in favor of a *Colorado River* stay.

Furthermore, there is a substantial possibility that proceeding with this action will result in piecemeal litigation. *Cone* emphasized that avoiding piecemeal litigation looms large in the *Colorado River* calcu-

---

aid programs. In the Medicaid context, the Second Circuit held that a case challenging the state's compliance with state law is a proper one for abstention.

Although the federal government has retained some control over Medicaid regulation, it has left the administrative and fiscal responsibilities to the individual states. [Plaintiff] seeks review of the reimbursement rates it has received not pursuant to any federal statute ... but pursuant to its contract with the State. New York has established a procedure for administrative review of the rate-making process, and judicial review of administrative decisions is available in New York Supreme Court under [CPLR Art. 78]. Thus the principles of comity that compelled abstention in *Alabama Public Service Commission v. Southern Railway Co.* and *Burford v. Sun Oil Co.* apply to this case, and the district court properly abstained....

*New York State Assn. for Retarded Children, Inc. v. Carey*, 727 F.2d 240, 245 (2d Cir.1984) (cita-

tions and footnote omitted). *See also Grossman v. Axelrod*, 466 F.Supp. at 779.

Similarly, in this case plaintiffs' claim is, in essence, that defendants have not fulfilled their duty under state law. Primary responsibility for AFDC and EA rests with the state. There is a procedure for administrative and judicial review of emergency assistance decisions. The state's interest in needy families is no less than its interest in destitute ill people. Abstention should be equally as warranted in the AFDC context as in the Medicaid context.

23. Moreover, I am extremely reluctant to countenance the kind of "procedural gamesmanship" engaged in by plaintiffs' attorneys in this case. *Cf. Hartford Accident & Indem. Co. v. Hop-On Int'l Corp.*, 568 F.Supp. 1569, 1573 (S.D.N.Y. 1983) (Court stayed federal declaratory judgment action where plaintiff was manipulating procedures to win race to courthouse).

lus. *Cone*, 460 U.S. at 19, 103 S.Ct. at 939 ("the consideration that was paramount in *Colorado River* [was] the danger of piecemeal litigation."). As defendant Perales points out, the state law claims against him cannot be litigated in federal court.

> To the extent [appellant] suggests that state officials are failing to comply with the state's own ... requirements, we are foreclosed from entertaining the claim by the Supreme Court's second decision in *Pennhurst State School & Hosp. v. Halderman*, [465] U.S. [89], 104 S.Ct. 900 [79 L.Ed.2d 67] (1984). *Pennhurst II* held that the Eleventh Amendment bars a federal court from ordering a state official to conform his conduct to state law.

*Woe v. Cuomo*, 729 F.2d 96, 102 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 339, 83 L.Ed.2d 274 (1984). *Accord Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239 (2d Cir.1984). So the claims against Perales arising under state law would need to be litigated separately in state court in any event.

Furthermore, the state court can give far more complete and comprehensive relief than can this court. Besides the main question of entitlement to housing, which is raised in both *McCain* and this litigation, *McCain* raises a host of subsidiary, related and intertwined issues not raised here. The state court has already dealt with some of these issues (for example, the procedural rights of the homeless). It is clear that *McCain* will provide a comprehensive decision on the rights of homeless families from a tribunal better suited to decide the issue than this one. The instant litigation raises only a single aspect of a complex problem. It is better to have a single, complete determination. Thus, the instant situation fits squarely into the *Colorado River* policy favoring comprehensive disposition of litigation.

▪ Source of law is another important factor under *Cone*. *See Cone*, 460 U.S. at

23–26, 103 S.Ct. at 941–942. In *Cone*, the Court stated that the presence of federal issues counsels heavily against declining jurisdiction. *Id.* at 25–26, 103 S.Ct. at 941–942. It is clear, however, that the presence of federal questions is not dispositive against a *Colorado River* stay. *See, e.g., Northeast Mines, Inc. v. Town of Smithtown*, 584 F.Supp. 112, 115–16 (E.D.N.Y. 1984); *North Am. Van Lines v. State Bd. of Tax Comm'rs*, 590 F.Supp. 311 (N.D.Ind. 1984); *Jackson v. Dept. of Pub. Safety*, 562 F.Supp. 324 (M.D.La.1983), *dismissed without opinion*, 755 F.2d 172 (5th Cir.1985). It is only when jurisdiction over the federal claims has been vested exclusively in the federal courts that the presence of a federal issue in the federal action is dispositive. *See, e.g., Kruse v. Snowshoe Co.*, 715 F.2d 120 (4th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1413, 79 L.Ed.2d 739 (1984); *Silberkleit v. Kantrowitz*, 713 F.2d 433 (9th Cir.1983); *Alkoff v. Gold*, 611 F.Supp. 63 (S.D.N.Y.1985).[24] In an appropriate case, even the presence of a federal constitutional issue does not prevent *Colorado River* abstention. *See, e.g., North Am. Van Lines, supra; Northeast Mines, supra; Garland v. Shapiro*, 579 F.Supp. 858, 861 (E.D.Mich.1984) (alternative holding).

In this case, it is plain that the primary battleground is state law, and unsettled state law at that. Clarification of that state law may well obviate the need for decision of a constitutional issue. There is no problem of exclusive federal jurisdiction here, and as I noted before, federal review of federal questions decided by the state court would remain available under 28 U.S.C. § 1257. Also, the state's interest in coherent development of policy in this area of vital state and local concern could be adversely affected if I were to entertain this case. The possibility of conflicting decisions would haunt the proceedings. Thus, a stay of these proceedings is appropriate to avoid duplicative litigation.

---

**24.** In certain suits, however, the case for abstention is so strong that even if federal jurisdiction over some of the claims is exclusive, the court should sever the federal claim, decide it, and defer to the state court as to the remaining issues in the case. *See, e.g., Levy v. Lewis*, 635 F.2d 960, 965–67 (2d Cir.1980).

Plaintiffs argue that *Colorado River* abstention is inappropriate here. First, they deny that *McCain* is parallel to this case because the plaintiffs are different. This argument is unpersuasive. True, "[o]nly in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Landis v. North Am. Co.*, 299 U.S. 248, 255, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936). That does not, however, remove from the court the power to stay "proceedings in one suit ... to abide proceedings in another," *id.* at 254, 57 S.Ct. at 166, when the circumstances call for such action.

Where the interests of the plaintiffs in each of the suits are congruent, *Colorado River* abstention may be appropriate notwithstanding the nonidentity of the parties. *See, e.g., North Am. Van Lines*, 590 F.Supp. at 318. Indeed, despite Justice Greenfield's denial of class certification in *McCain*, so far as I can see from the record every order issued in that case has been issued on terms generally applicable to all homeless families. If plaintiffs in *McCain* prevail, the remedy prayed for—an injunction ordering defendants to provide "lawful emergency shelter" to all homeless families—would benefit Daisy Canaday no less than Yvonne McCain. Thus, I do not accord great weight in this case to the fact that plaintiffs herein are technically not represented in *McCain*.

Next, plaintiffs object that the state court will not be more familiar with the issues than this court because Justice Greenfield has indicated that he has ended his involvement in *McCain*. This has no impact on my decision here, though. A federal court defers to a state *court*, not to an individual *judge*. Moreover, because of the comity considerations present in this case, it is desirable in any event to have complex unsettled questions of state law decided by a state judge, who has greater competence in state law than a federal court, irrespective of whether he or she has read prior submissions in the case. The federal court's abstention decision does not turn on the state court's system of assignment and rotation.

There is also no merit in plaintiffs' claim that the state court can not give prompt relief. I do not comprehend the logic that says a federal court can familiarize itself with the intricate workings of the City's and State's welfare policymaking, unravel the various unsettled state law issues and fashion appropriate relief more easily and quickly that the state system can rule on its own law.

In sum, I find it appropriate in this case to exercise my discretion to defer to the state court.[25] This case will be placed on the suspense docket. After *McCain* is decided and the issues settled, the parties may return to this Court. At that point, deciding this case should be a greatly simplified task, entailing no interference with the state system. In the meantime, aggrieved individuals have recourse to the state administrative apparatus and to Article 78 proceedings in state court to review denials of lawful benefits.

Since I am staying this case, the motion of proposed plaintiff-intervenors for intervention, class certification, and a preliminary injunction is denied.

SO ORDERED.

**25.** The cases cited by plaintiffs are inapposite. In *Giardina v. Fontana*, 733 F.2d 1047 (2d Cir. 1984), the state court in which the allegedly parallel litigation was pending did not have subject matter jurisdiction over some of the claims asserted in the federal proceeding. Thus, there would in any event have had to be piecemeal litigation. In *United States v. 21.5 Acres*, 584 F.Supp. 1093 (S.D.N.Y.1984), certain claims were raised in the federal action which had not been raised in the state court action, so the suits were not in fact parallel. In this case, by contrast, there is no issue raised in the federal action that is not raised in the state action, and the state court has full power to decide all claims raised by any plaintiff against any defendant.